## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TAYSSOUN TRANSPORTATION, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-1074 |
| | § | |
| UNIVERSAL AM-CAN, LTD., | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>[1]

Pending before the Court in this commercial dispute are cross motions for summary judgment on Plaintiff's claims, Plaintiff's application for a preliminary injunction, Plaintiff's motion to dismiss Defendant's counterclaim, and Defendant's motion for summary judgment on Plaintiff's affirmative defenses to Defendant's counterclaim.[2] These motions are ripe for decision. Having considered the parties' submissions, all matters of record, and the

---

[1]    The Memorandum and Order has been ***revised*** in various ways from the draft informally provided to counsel at the pretrial conference held on April 19, 2005. The April 19th draft was not issued or filed; it is a nullity.

[2]    Plaintiff has filed a Memorandum in support of its Motion for Summary Judgment, Application for Preliminary Injunction, and Motion to Dismiss Counterclaim [Doc. # 24] ("Plaintiffs' Motion"), to which Defendant has filed a Response [Doc. # 27]. Defendant has filed a Motion for Partial Summary Judgment [Doc. # 26] ("Defendant's Motion"). Plaintiff has filed a Reply in support of its Motion and in opposition to Defendant's Motion [Doc. # 38]. Defendant has filed a Reply in support of its Motion [Doc. # 39], and Plaintiff has filed a Surreply in support of its Motion [Doc. # 40].

applicable legal authorities, the Court concludes both parties' motions should be **granted in part and denied in part.**

I.      **BACKGROUND AND PARTIES' BASIC CONTENTIONS**

    A.      **Factual Background**

This is a commercial dispute regarding monies owed following the termination of the Contractor Operating Agreement ("Agreement") between Plaintiff Tayssoun Transportation, Inc. ("Tayssoun"), an independent "owner-operator" of a fleet of trucks and related equipment, and Defendant Universal Am-Can, Ltd., ("UACL"), a federally regulated interstate motor carrier.  Tayssoun claims that the Agreement, which was drafted by UACL, violates federal laws and regulations pertaining to interstate motor carriers, and that UACL's actions violated Article 21.21 of the Texas Insurance Code.  Tayssoun seeks summary judgment on its claims under federal "Truth-in-Leasing" regulations and Article 21.21 of the Texas Insurance Code, and prays for dismissal of UACL's counterclaim.  Tayssoun also requests a preliminary injunction barring UACL's future use of the Agreement in its dealings with other owner-operators.  UACL seeks summary judgment dismissing all of Tayssoun's claims and affirmative defenses to its counterclaim.

UACL is registered as a motor carrier with the United States Department of Transportation ("DOT"), but does not own any trucks or employ its own drivers.  In June 2001, the parties entered into the Agreement, an arrangement known as a "lease" and common in the commercial trucking industry.  All of UACL's shipping operations are

conducted through lease agreements with unregistered owner-operators such as Tayssoun. In these agreements, UACL hires owner-operators to pick up, haul, and deliver its cargo. As the federally regulated motor carrier, UACL provides to owner-operators the requisite DOT certification, a customer base, and a variety of administrative services such as billing and collections. UACL's customers are "shippers" of cargo who deal only with UACL. UACL is the sole entity from which shippers may obtain compensation if cargo is damaged.[3]

UACL and Tayssoun agreed to share revenue on a percentage basis, subject to numerous adjustments and "charge-backs," as provided in the Agreement. In the Agreement, UACL promised to obtain cargo insurance coverage for shippers. Federal "Truth-in-Leasing" regulations require that leases between motor carriers and owner-operators contain extensive disclosures on issues such as compensation and insurance.

From June 2001 until February 2004, UACL and Tayssoun operated under the Agreement at issue. At the conclusion of the Agreement, UACL informed Tayssoun that it would not pay earned but unpaid commissions, refundable escrows, unpaid loads, or unpaid detention,[4] which Tayssoun maintains total $369,820.39. UACL contends that it has the right to withhold these funds under the Agreement because Tayssoun's damages to cargo,

---

[3]    Shippers' remedies are limited to actual damages under the Carmack Amendment. *See Hoskins v. Bekins Van Lines*, 343 F.3d 769, 777-78 (5th Cir. 2003).

[4]    The parties appear to use the term "detention" to refer to sums paid due to delays in loading and unloading cargo.

It is noted that the parties do not focus on the escrows. However, escrow funds are the subject of detailed federal regulations in the carrier/owner-operator context. *See* 49 C.F.R. § 376.12(k). The Court does not address claims, if any, concerning these accounts.

for which UACL is responsible to shippers, exceeded the amount that UACL owes to Tayssoun.  During the course of their business relationship, UACL charged Tayssoun $34,409.20 for "cargo insurance" and $12,853.46 in "deductibles."  Tayssoun also seeks to recover these monies.

UACL  asserts a counterclaim in the amount of $868,857.67 for reimbursement for damages allegedly caused by Tayssoun to shippers' cargo.  UACL asserted the right to these damages for the first time after the Agreement was terminated.  UACL contends that Tayssoun's drivers at times "rammed" cargo into bridges, overpasses, and trees; secured cargo improperly; failed to tarp cargo and drove in the rain; and failed to make timely deliveries.  UACL claims that shippers asserted over 100 cargo claims against it for shipments moved by Tayssoun.  UACL has paid many, but not all, of the claims.  Although UACL obtained cargo insurance for shippers as promised in the Agreement, the policy that it purchased was a "fronting policy" that carries an extremely high deductible.  In essence, UACL acted as a self-insurer.  UACL now seeks to collect the cost of all cargo damage claims asserted by shippers on loads Tayssoun transported during the course of the Agreement.  The validity of these cargo claims individually is not before the Court at this time.

**B.**    **Legal and Regulatory Framework for Motor Carriers**

Under federal law, motor carriers are required to register with the DOT, and to comply with certain regulations, in order to ship most types of cargo in interstate commerce.

*See* 49 U.S.C. §§ 13901, 13902; 49 C.F.R. §§ 367.4, 367.7.  These statutes and regulations are discussed where pertinent to the parties' claims.

## II.   APPLICABLE PROCEDURAL STANDARDS

### A.   Summary Judgment Motions

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).  An issue is material if its resolution could affect the outcome of the action.  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be  reviewed in the light most favorable to the nonmoving party.  *Hotard v. State Farm Fire & Cas. Co.,* 286 F.3d 814, 817 (5th Cir. 2002). However, factual

controversies are resolved in favor of the nonmovant "only when there is an actual controversy – that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.* If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Smith v. Brenoettsky*, 158 F.3d 908, 911 (5th Cir. 1998)); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998); *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that "unsworn pleadings do not constitute proper summary judgment evidence," quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994)). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this

burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

### B.   Motions to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004) (citing *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)). The complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true. *Id.* A claim may only be dismissed if the plaintiff is not entitled to relief under any set of facts or any possible theory of recovery that he could prove consistent with the allegations in his complaint. *Id.* (citing *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).

In deciding whether a claim should be dismissed, this Court must determine whether the complaint states a valid claim for relief when the pleading is construed in the light most favorable to the plaintiff and with every doubt resolved on the plaintiff's behalf. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The plaintiff's complaint must contain allegations of every material point necessary to sustain recovery. *Campbell v.*

*City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).  Statements that merely create a suspicion that the plaintiff may have a right of action do not foreclose a motion to dismiss. *Id.*  Furthermore, legal conclusions, conclusory allegations, and unwarranted deductions of fact do not suffice to prevent dismissal.  *Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003).  If the plaintiff fails to allege a necessary element to obtain relief, then dismissal is proper. *Campbell*, 43 F.3d at 975.  A motion to dismiss should also be granted when a successful affirmative defense appears on the face of the pleadings.  *Kansa Reinsurance Co. v. Cong. Mortgage Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994).

## III.   UACL'S SUMMARY JUDGMENT MOTION ON TAYSSOUN'S CLAIMS

UACL moves for summary judgment dismissing all Tayssoun's federal and state claims as a matter of law.  The Court concludes Tayssoun's claims under Article 21.21 are not legally viable, and UACL's summary judgment motion is granted in this regard.  The Court also concludes that Tayssoun cannot state a claim for false charges under 49 U.S.C. § 14704(b).  However, UACL's summary judgment motion is denied insofar as it contends that there is no private right of action for violations of the Truth-in-Leasing regulations codified as 49 C.F.R. Part 376 (2003).

### A.   Texas Insurance Code Claims

Tayssoun claims that UACL violated the Texas Insurance Code Article 21.21 by committing various unfair and deceptive practices.  UACL asserts several defenses, including federal preemption of Article 21.21, the inapplicability of the Texas Insurance Code to the circumstances in this case, lack of standing, and failure of Tayssoun to allege cognizable

damages.  The Court holds that UACL is not a person in the "business of insurance" and thus does not reach the issues of federal preemption, whether Tayssoun has standing to bring its Insurance Code claims, or whether Tayssoun has pleaded adequate damages to proceed with those claims.

### 1.    Overview

UACL argues that it is entitled to summary judgment on Tayssoun's Article 21.21 claims on the merits because a motor carrier like UACL does not become a "person" engaged in the "business of insurance," for purposes of Article 21.21, by allocating in a contract responsibilities to procure and pay for cargo insurance, or by managing its own risk through purchase of a "fronting" insurance policy and paying claims from its own assets.  UACL urges that Texas courts have been reluctant to expand the meaning of "business of insurance" beyond insurance companies selling insurance contracts.  Tayssoun disagrees, arguing that UACL charged it for "cargo insurance" and insurance "deductibles."  Tayssoun insists that the fact that UACL did not issue an insurance policy in return for Tayssoun's consideration is a central feature of the insurance deceptive practices.  The Court concludes that UACL is not subject to suit under Article 21.21.

Article 21.21 of the Texas Insurance Code applies to

any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, and ***any other legal entity engaged in the business of insurance***, including agents, brokers, adjusters and life insurance counselors.

TEX. INS. CODE art. 21.21, § 2(a) (emphasis added).  Article 21.21 does not define "the business of insurance,"  but the statute mandates that its provisions "shall be liberally construed and applied to promote its underlying purpose," the regulation of "trade practices in the business of insurance . . . which constitute unfair methods of competition or unfair or deceptive acts or practices."  *Id*. § 1.

A defendant is not subject to Article 21.21 if the party is not "in the business of insurance."  *See, e.g., Great American Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 420-24 (Tex. 1995) (insurance company did not engage in business falling under scope of Article 21.21 in issuing surety bond); *Dallas Fire Ins. Co. v. Texas Contractors Sur. & Cas. Agency,* — S.W.3d —, 2004 WL 2913657 (Tex. Dec. 17, 2004) (same); *Bennett v. Bank United,* 114 S.W.3d 75, 85 (Tex. App.–Austin 2003, no pet.) (mortgage company that collected mortgage insurance premiums from debtor did not engage in the business of insurance); *Texas Health Enter., Inc. v. Gentry,* 787 S.W.2d 604, 607 (Tex. App.–El Paso 1990, no writ) (employer who offered self-funded medical benefits to employee did not engage in the business of insurance).

The parties dispute whether UACL was in the business of insurance – or even sold Tayssoun insurance – under the Agreement.  The Court addresses first the question of whether the terms of the Agreement resulted in the sale by UACL of insurance to Tayssoun, and then turns to the issue of whether UACL is in the "business of insurance" as that phrase is construed under Texas law.

### 2.    Terms of the Agreement

Broadly speaking, the Agreement is a lease by Tayssoun to UACL of Tayssoun's staff and fleet of motor vehicles, specifically, tractors and trailers that carry cargo, in exchange for UACL's supplying Tayssoun with the required federal carrier's certification and other services.  The Agreement provided that UACL would book trips for Tayssoun's fleet to haul cargo, but Tayssoun would actually operate the equipment through drivers and other staff it hired and trained.   Tayssoun had the right but not the obligation to haul cargo when requested by UACL, and had to do so in accordance with all applicable laws and regulations, and without damage to the commodities.  Agreement, § 4.  The parties agreed to a split of the revenues collected by UACL for Tayssoun's transportation of cargo on trips booked by UACL.

There are several provisions in the Agreement that pertain to cargo damage and insurance. First, UACL assumed "exclusive control" of Tayssoun's equipment and agreed to be responsible to third parties for operation of the equipment.[5]   UACL also agreed to

---

[5]    Section 1 of the Agreement stated:

> 1. Carrier [UACL] shall have exclusive control and possession of the Equipment . . . during the term of this Agreement[,] together with drivers and all other necessary labor, to transport, load and unload exclusively on behalf of Carrier. . . .
>
> **Carrier shall be responsible to third parties for operation of the equipment** under this Agreement while under the exclusive control and possession of Carrier in pursuance of its service to the public. **Carrier shall maintain insurance coverage for the protection of the public pursuant to all applicable regulations of the [Interstate Commerce Commission], if**
>
> (continued...)

maintain insurance coverage for the protection of the public pursuant to all applicable regulations.[6]  Section 11 also required UACL to maintain cargo insurance "at its own expense" for the benefit of shippers and the public.[7]  Tayssoun agreed to "reimburse" UACL

---

[5]        (...continued)
           *any.*

(Emphasis added.)  The provision in § 1 that UACL, the carrier, shall have "exclusive control and possession" of the equipment is arguably inconsistent with requirements in other sections of the Agreement which require Tayssoun, the "Contractor," to "determine the means and methods of the performance of all transportation service undertaken by the Contractor under the terms of this agreement."   Agreement, § 7.   Tayssoun also had responsibility for "maintaining" the equipment (*id.* §§ 6(A), 7(B)).  The Court recognizes this allocation of roles parrots the Truth in Leasing regulations, 49 C.F.R. § 376.12, and there is no need to address this matter.

[6]        *Id.* § 1 (second paragraph).

[7]        Section 11 provides in its entirety:

           11.   The Contractor (Tayssoun) agrees to carry bobtail and off-dispatch insurance coverage with respect to public liability and property damage in [specified] limits . . . in any accident as concerns all equipment hereunder when not used in performance of a trip under this agreement and agrees to furnish evidence of such coverage to Carrier and arrange for Carrier to be named as additional insured under such a policy.

           ***Contractor shall be responsible and liable to Carrier, and agrees to pay, subject to a limitation contained in schedule 'B',*** which is incorporated herein by reference[,] ***for shortage of, loss or damage to cargo transported by Contractor in the event that such shortage, loss or damage is caused directly or indirectly by the operations of Contractor or its employees or agents***.  Such monies shall be deducted from any monies due Contractor under this Agreement.  The Carrier shall in no way be liable for any damage, fire or theft which may occur to the equipment.  Pursuant to Rules and Regulations of the I.C.C. and/or any other regulatory agency, ***the Carrier shall maintain at its own expense public liability damage and cargo insurance coverage as concerns shippers and the general public****; however, **Contractor is required to reimburse Carrier for the deductible amounts of these coverages (as specified on Exhibit "B" attached hereto) for any loss***

                                                              (continued...)

"for the deductible amounts of these coverages (as specified on Exhibit 'B' attached hereto) for any loss caused to the cargo while in [Tayssoun's] control and handling," which included "loading, unloading, transportation and storage" of cargo.  UACL was authorized to deduct these "deductible amounts" "from any monies [due] to [Tayssoun]."  Finally, UACL was to "provide a written explanation and itemization of any deductions made under this [Section] 11."  *Id.*

Exhibit B limited the insurance-related provisions in § 11 of the Agreement.  Exhibit B first stated that Tayssoun must pay UACL (through deductions from Tayssoun's compensation) a "fee" for "cargo insurance":

Contractor authorizes Carrier to deduct from this compensation:

1.      A fee of $5.00 per trip, not to exceed 1% (one percent), but not less than $1.50 per load will be deducted per trip for cargo insurance [hereafter, the "$5.00 per trip fee"].

In addition, Exhibit B provided that Tayssoun authorized UACL to deduct from its compensation the following:

3.  Damage or delays resulting from driver negligence
*      *      *      *

---

[7]      (...continued)
*caused to the cargo while in the control and handling of the Contractor,* including, but not limited to, loading, unloading, transportation and storage, if necessary, and that amount will be deducted from monies [due] to Contractor.  Carrier shall provide a written explanation and itemization of any deductions made under this [Section] 11.

(Emphasis added.)  The Agreement uses the terms "Schedule 'B'" and "Exhibit 'B'" in different places, but there is only one pertinent attachment to which the Agreement could be referring.  The Court uses the terms "Schedule 'B'" and "Exhibit 'B'" interchangeably.

7.   In accordance with Para 11[,] your deductable [*sic*] on claim loads will be set at a maximum of $250.00 per occurrence [*sic*], unless negligence caused by contractor, then all charges will be billed to the Contractor.

It is undisputed that UACL paid for and obtained a cargo and liability insurance policy for its benefit in connection with paying cargo damage claims of shippers and injury claims by the "public."  However, the policy that UACL purchased did not actually provide coverage for payments UACL made to settle shippers' damage claims.  Instead, UACL chose essentially to self-insure.  To satisfy federal requirements that motor carriers have insurance for the benefit of the public and shippers, UACL purchased "fronting policies" from Royal Insurance Company of America, and later, National Union Fire Insurance Company of Pittsburgh (collectively referred to as the "Cargo Policy").  The named insured on the Cargo Policy was UACL.  At all times relevant to this litigation, the Cargo Policy's deductible almost equaled the policy benefit limits; specifically, the deductible for each claim was $999,995.00 and the policy limits were $1 million.  Fronting policies apparently are a legitimate and common practice for motor carriers such as UACL because carriers believe they can manage liability claims more efficiently and effectively than third parties.[8]  The Cargo Policy differs from fronting policies in other industries because it contains a federally-mandated endorsement, which requires the insurer to compensate injured shippers regardless of the deductible.  Thus, the shipper is fully protected up to the limits of the policy in the

---

[8]      Tayssoun Depo. at p.214, ln. 17 through p.215, ln.1; Eanes Depo. at p.60, ln. 20 through p.62, ln. 16; *id.* at p.64, lns. 12-22; *id.* at p.70, lns. 1-4; *id.* at p.74, lns. 8-23; *id.* at p.94, ln. 23 through p.95, ln. 3.

event that UACL is unable or unwilling to pay.  As practical matter, so long as UACL had funds to pay the shippers for any damage, UACL's Cargo Policy did not shift the risk of loss to the Cargo Policy insurance carrier.

It is undisputed that Tayssoun was unaware during its performance of the Agreement that UACL's Cargo Policy was in fact a fronting policy.  It also is undisputed that UACL charged Tayssoun the $5.00 per trip fee "for cargo insurance," as provided in Exhibit B to the Agreement.  Further, it is undisputed that UACL deducted sums of varying amounts (often $250) from Tayssoun's compensation during the term of the Agreement as reimbursement for UACL's payment of cargo claims asserted by shippers.[9]

This suit concerns Tayssoun's claims for sums due from UACL for services rendered under the Agreement, as well as UACL's claims against Tayssoun, asserted after termination of the Agreement, for substantial monies to reimburse it for shippers' cargo claims.

### 3.    Legal Principles Governing Construction of the Agreement

The legal principles of contract interpretation are the same irrespective of whether the Agreement provides for insurance.  *See Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir.  2000) (under Texas law, the meaning of an insurance contract is determined under the standards applicable to contracts generally); *Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d 764, 767-68 (5th Cir. 1995); *Barnett v. Aetna Life Ins. Co.*, 723

---

[9]     According to the parties' briefs, the deductions UACL took from Tayssoun's compensation varied.  There is no explanation for the amounts UACL deducted.  While often the deductions were for $250, some are more, a couple are less, and occasionally UACL charged no "deductible."

S.W.2d 663, 665 (Tex. 1987).  A court's primary concern is to give effect to the intention of the parties as expressed by the policy language.  *Cicciarella*, 66 F.3d at 768; *Ideal Lease Service, Inc. v. Amoco Production Co.,* 662 S.W.2d 951, 953 (Tex. 1983).

"The determination of whether a contract is ambiguous is a question of law." *Cicciarella*, 66 F.3d at 768; *Yancey v. Floyd West & Co.,* 755 S.W.2d 914, 917 (Tex. App.-- Fort Worth 1988, writ denied); *see H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998); *Memorial Med. Ctr v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)); *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  Determining whether ambiguity exists, the court must look at the contract as a whole in light of the circumstances existing at the time of execution.  *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (citing *In re El Paso Refinery, LP*, 302 F.3d 343, 353 (5th Cir. 2002)); *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993).

The terms of a contract are ambiguous if they are subject to two or more reasonable interpretations.  *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998); *see also Cicciarella*, 66 F.3d at 768 ("A contract is ambiguous only 'when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning.'" (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983))).  On the other hand, if the terms of the contract can be given a definite or certain legal meaning, then the contract is not ambiguous.  *H.E. Butt*, 150 F.3d at 529; *Nat'l Fire Ins.*, 907 S.W.2d at 520.  If a contract is subject to more than one reasonable interpretation, courts must use *contra proferentum* and adopt the

construction most favorable to the non-drafting party.  *State Farm Fire & Cas. Co. v. Vaughn*, 968 S.W.2d 931, 933 (Tex. 1998); *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 n.1 (Tex. 1998); *Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 676-77 (Tex. App.–Austin, 2003, no pet. hist.).  In an insurance contract, if "a contract is susceptible to more than one reasonable interpretation, a court will resolve any ambiguity in favor of coverage."  *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co., Inc.*, 112 F.3d 184, 186 (5th Cir. 1997); *Texas Dep't of Housing & Community Affairs v. Verex Assurance, Inc.,* 68 F.3d 922, 928 (5th Cir. 1995); *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex. 1991); *accord Mid-Continent*, 206 F.3d at 491.

The parol evidence rule precludes consideration of extrinsic evidence to contradict, vary or add to the terms of an unambiguous written agreement absent fraud, accident or mistake. *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 370 (Tex. App.–Houston [14th Dist.] 2000, no pet.).  Parol evidence is not admissible for the purpose of creating an ambiguity. *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 857 (Tex. App.–Houston [14th Dist.], 2003, no pet. hist.); *Licata v. Licata,* 11 S.W.3d 269, 277 (Tex. App.–Houston [14th Dist.] 1999, no pet.); *CBI Indus.*, 907 S.W.2d at 520; *see Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998).  Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument. *CBI Industries*, 907 S.W.2d at 520 (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981)); *Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405, 408 (5th Cir.

1995). "The fact that the parties disagree as to coverage does not create an ambiguity." *Sharp v. State Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258, 1261, *reh'g denied,* 122 F.3d 1068 (5th Cir. 1997); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994).

### 4.    "Business of Insurance" for Purposes of Article 21.21

Tayssoun contends that UACL was in the business of insurance and reasons that Article 21.21 of the Texas Insurance Code applies because UACL sold Tayssoun a cargo insurance policy in exchange for the $5.00 per trip fee, and the coverage limited Tayssoun's liability for cargo damage to $250 per incident.  Tayssoun points to § 11 of the Agreement which must be read with the "limitation" in Exhibit B.  Tayssoun argues it had, or at least reasonably believed it had, cargo insurance from or through UACL that limited Tayssoun's liability to $250 per occurrence.  UACL contends that it did not sell Tayssoun insurance and was not in the "business of insurance" for the purposes of Article 21.21.  UACL asserts vaguely that the $5.00 per trip fees paid by Tayssoun were "to protect UACL and the shippers," as required by federal law, not to protect Tayssoun.  UACL contends that it did not purchase or provide any cargo insurance for Tayssoun's benefit.  UACL also contends that under the Agreement, Tayssoun was responsible to pay for all damages caused by its own negligence and the $250 deductible applied only where Tayssoun was not "negligent" in hauling cargo.  The Court agrees with UACL that UACL did not sell Tayssoun insurance, but agrees with Tayssoun that the Agreement contained a $250 limitation of Tayssoun's liability for cargo damage under certain circumstances.  However, Tayssoun overstates the breadth of that $250 limitation of liability.

As explained in a leading treatise, "insurance is a contract by which one party (the insurer), for a consideration that usually is paid in money, either in a lump sum or at different times, during the continuance of the risk, promises to make a certain payment, usually of money, upon the destruction of injury of 'something' in which the other party (the insured) has an interest."  1 COUCH ON INSURANCE 3D § 1.6, at 1-11 (hereinafter "COUCH").[10] "Insurance" is generally understood to be "an agreement by which one party assumes a risk faced by another party in return for a premium payment."  BLACK'S LAW DICTIONARY 803 (7th ed. 1999) (Bryan A. Garner ed.).[11]   More specifically, "cargo insurance" is "[a]n agreement to pay for damage to freight damaged in transit."  Id.  "The character of insurance is not to be determined by the character of the company writing it, the nomenclature used,

---

[10]    "[I]n individual insurance policies, the insured entity is essentially the party purchasing the insurance." Id. § 1:2, at 1-5.  According to Couch, "[o]ther common definitions of insurance are (1) a contract to pay a sum of money upon the happening of a particular event or contingency; (2) indemnity for loss in respect of a specified subject by specified perils; (3) an undertaking by one party to protect another party from loss arising from named risks, for the consideration and upon the terms and under the conditions recited; . . . (5) a contract whereby one party promises for a consideration to indemnify the other against certain risks." Id. at 1-12 (footnotes omitted).  "Indemnity" is defined as "security or protection against hurt or loss or damage," through providing security such as through a bond, or by providing compensation for actual damage that has occurred.  See id. § 1:7, at 1-13.

[11]    The Supreme Court in Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211 n.7 (1979), cited WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1289 (unabr.2d ed. 1958), which defined insurance as:

> Act of insuring, or assuring, against loss or damage by a contingent event; a contract whereby, for a stipulated consideration, called a premium, one party undertakes to indemnify or guarantee another against loss by a certain specified contingency or peril, called a risk, the contract being set forth in a document called the policy . . .."

or the manner or mode of affording insurance, but by the nature of the contract actually entered into or issued."  Couch § 1:8, at 1-14 (footnote omitted).  "The mere inclusion of an indemnity clause in a contract for services does not automatically render the indemnifying party an 'insurer' of the other party."  *Id.* § 1:8, at 1-15 (footnote omitted).[12]  "The primary requisite essential to a contract of insurance is the assumption of a risk of loss and the undertaking to indemnify the insured against such loss."  *Id.* § 1:9, at 1-16.  "In the classic instance of insurance, the risk is controlled only by chance or nature," and "[a]n insurer is the primary party liable upon the occurrence of the contingency" and "must bear the ultimate loss."[13]  *Id.* § 1.18, at 1-31.

Further, the United States Supreme Court has held that "[t]he primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk.  'It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it.'"  *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067 (1979) (citing 1 G. Couch, Cyclopedia of Insurance Law § 1:3 (2d ed. 1959); R. Keeton, Insurance Law § 1.2(a) (1971)

---

[12]     The label the contract bears may be considered but is not determinative, because all the terms in the contract must be considered.  Couch, § 1.8, at 1-14.  "The mere use of, or the failure to use, specific words, cannot alter the underlying nature of the contract," and courts are to look behind the terminology used.  *Id.*  It is not necessary that a definite fund be set aside to meet the insurer's obligations.  *Id.* § 1.8, at 1-15.

[13]     There is sometimes an exception for liability insurance and automobile insurance, where the insurer may seek from another party reimbursement for the insurer's loss.  *See id.* § 1.18, at 1-31.

("Insurance is an arrangement for transferring and distributing risk"); 1 G. RICHARDS, THE LAW OF INSURANCE § 2 (W. Freedman 5th ed. 1952)).[14]  "[T]he 'earmark' of insurance was described as the 'underwriting of risks' in exchange for a premium." *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 73, 79 S.Ct. 618, 623, 3 L.Ed.2d 640 (1959).

The primary purpose of the Agreement was transportation of cargo for shippers in trips booked by UACL using equipment and drivers leased from Tayssoun.  Under the Agreement, UACL controlled the equipment, which was maintained and operated day-to-day by Tayssoun.  The parties allocated between themselves the risk of damage to cargo, although the boundaries for each party's ultimate financial responsibility are not totally clear. UACL, as the entity with the carrier certification, was required by law to have insurance for the benefit of the shippers and the public, and to pay shippers' claims for cargo damage directly.  As a practical matter, UACL self-insured these risks, and obtained a fronting policy (the Cargo Policy) to satisfy its legal obligations for this insurance; UACL then leased trucks and staff from Tayssoun.

---

[14]     The Texas Supreme Court held that suretyship contracts were not the "business of insurance" for the purposes of Article 21.21, even though those contracts were regulated by the Texas Department of Insurance and were governed for regulatory purposes by the Texas Insurance Code.  *See Great American Ins. Co. v. North Austin Mun. Utility Dist. No. 1*, 908 S.W.2d 415, 416 (Tex. 1995).  In reaching that conclusion, the *Great American* court stated that the federal construction of the "business of insurance" for the purpose of determining if a particular activity is exempted from the antitrust laws has no application to the protection afforded state regulation from attack under the Commerce Clause."  908 S.W.2d at 421 (citing *Royal Drug Co.*, 440 U.S. at 218 n.18), indicating that the federal standard was overly broad for the purposes of delineating the boundaries of Article 21.21.  Nevertheless, the Texas Supreme Court did not reject the federal definition of insurance.

To state a claim under Article 21.21, Tayssoun must be an "insured" and UACL must be in the "business of insurance."  Tayssoun focuses on the $5.00 per trip fee it paid to UACL "for cargo insurance," Agreement, Exhibit B, ¶ 1, a fee analogous to an insurance premium on each cargo load.   Tayssoun points also to its obligation to pay a "deductable [*sic*] on claim loads . . . [of] a maximum of $250.00 per occurrence [*sic*] . . .."  *Id*., Exh. B, ¶ 7.  The concepts of premiums and deductibles support the argument that Tayssoun was an insured with an insurance relationship with UACL.  *See id*. § 7 (Tayssoun to pay UACL for cargo damage, subject to Exhibit B, and Tayssoun to reimburse UACL for "deductible amounts of these coverages (as specified on Exhibit B. . .) for loss . . . to cargo.").  The Agreement does not specify who, if anyone, supplied the cargo insurance for which the fee was paid.  While UACL received the $5.00 per trip fee "for cargo insurance," *i.e.*, a putative insurance premium, UACL apparently kept the fees in a cargo claims account for its own purposes, namely, to offset claims on cargo shipped by Tayssoun.  *See* Cochran Depo., at 64-65.  To state a claim under Article 21.21, Tayssoun must demonstrate that UACL is the insurer under the parties' insurance contract.  This assertion has little foundation when the Agreement is examined in its entirety.

Tayssoun has not shown that UACL satisfies the legal criteria of the "insurer." Usually, an insurer pays indemnity to the insured for losses but is not a primary actor in the activity being insured.  Here, UACL controlled the equipment and was directly "responsible" to third parties "for operation of the equipment."  Agreement, § 1.  It was UACL that had the business relationship with the shippers; shippers were required to assert their cargo claims

against UACL; and UACL paid shippers' claims arising from Tayssoun's conduct hauling loads. This shipper/UACL relationship was required by federal law. 49 C.F.R. § 376.12(c)(1). Thus, the claims in question were asserted by shippers against UACL; UACL was not paying indemnity for claims shippers asserted against Tayssoun.

Further, a contract of insurance contemplates that the insurer will assume risk of loss and undertake to indemnify the insured against such loss. *See* COUCH § 1:9, at 1-16. Under UACL's interpretations of the Agreement, Tayssoun was required to repay UACL for amounts the latter paid third parties for almost all cargo damage caused in any way by Tayssoun. Although the scope of Tayssoun's obligation to reimburse UACL is the subject of heated dispute,[15] the Agreement states that Tayssoun must pay[16] the costs of "[d]amages or delays resulting from driver negligence" (Agreement, Exh. B, ¶ 3) and "all charges" for incidents involving "negligence caused by [Tayssoun]." *Id.*, Exh. B, ¶ 7. The obligation for Tayssoun to repay substantial sums to UACL to reimburse UACL for damages paid to third party shippers arising from Tayssoun's conduct is contrary to the basic concept of insurance that shifts the risk of loss.[17]

---

[15]    The scope of Tayssoun's reimbursement obligation will be discussed to the extent necessary hereafter.

[16]    These payments are made through UACL's deduction from Tayssoun's compensation the necessary funds. *See* Agreement, § 11 & Exh. B.

[17]    UACL contends that the "deductible" in fact equals the full amount of the claim paid to the third party when Tayssoun causes cargo damage through its negligence. If this interpretation is adopted, then there is no semblance of any indemnity to constitute an insurance benefit to Tayssoun for the majority of the shippers' claims in issue.

In addition, other indicia of an insurance contract relationship are missing from the Agreement. There was no insurance contract separate from the parties' overriding Agreement governing their business relationship. There was no express definition of who was the "insurer" and who was the "insured." UACL, a company certified as an interstate carrier of cargo, is not primarily in the insurance business. Tayssoun does not argue there is any "spreading and underwriting of a policyholder's risk." *See Royal Drug Co.*, 440 U.S. at 211. Even Tayssoun's insurance expert has admitted that the Agreement is not an insurance policy. Eanes Depo., at 87. In sum, the Agreement allocated responsibility for cargo loss between the parties. Despite language suggestive of insurance in the Agreement, the Court is unpersuaded that UACL contracted to be Tayssoun's insurer for cargo damage. Moreover, contrary to Tayssoun's assertion, the Agreement on its face lacked similarity to a legitimate insurance policy and thus the alleged misrepresentations are not wrongs addressed by the Texas Insurance Code.

Turning to the related question of whether UACL was in the "business of insurance," the Court concludes that Tayssoun has not shown in the summary judgment record that UACL was in the "business of insurance" for Article 21.21 purposes. An Article 21.21 action may be maintained against "the person or persons engaging in [specified deceptive] acts or practices." TEX.INS.CODE art. 21.21, § 16. Article 21.21 defines the term "person" to mean "any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including agents, brokers, adjusters and life insurance counselors."

*Id.* § 2(a).  The "business of insurance" is not defined in article 21.21.  The parties have cited no cases on point in Texas or otherwise of a private party engaging in the business of insurance when not regulated by any government agency, and the Court has discovered none in which the issue of the existence of insurance (rather than mere shifting of risk) and the business of insurance is addressed in an appropriate context.  The Texas Supreme Court has held that suretyship contracts are not the "business of insurance" for the purposes of Article 21.21 protections, even though those contracts were regulated by the Texas Department of Insurance and were governed for regulatory purposes by the Texas Insurance Code.  *See Great American Ins. Co. v. North Austin Municipal Utility District No. 1*, 908 S.W.2d 415, 424 (Tex. 1995)[18]; *Dallas Fire Ins. Co. v. Texas Contractors Sur. & Cas. Agency,* — S.W.3d —, 2004 WL 2913657 (Tex. Dec. 17, 2004).  The arrangement between UACL and Tayssoun is not a suretyship, and thus these authorities are not dispositive.  *Dicta* in these cases nevertheless indicates the Texas Supreme Court's thinking on the scope of the term "business of insurance."  These authorities suggest that UACL is not engaged in the business of insurance.  First, in declining to find the defendant in *Great American* was "in the business of insurance," the Texas Supreme Court stated that "[i]nsurance involves the pooling and spreading of risk of the insureds, with no right of indemnity possessed by the insurer."  *Id.* at 424.  As noted, Tayssoun has not shown that UACL was involved in the "pooling or spreading of risk" regarding Tayssoun's responsibility for the cargo

---

[18]     The result in this case has been subject of some criticism. M.L. Kincaid & C.W. Martin, TEXAS PRACTICE GUIDE INSURANCE LITIGATION,  § 2.2.

transportation under the Agreement.  Rather, the Agreement provided that the risk was, in the first instance, borne by UACL, who was entitled to reimbursement of the damages from Tayssoun under certain circumstances.

The *Dallas Fire Insurance Company* court, in reaching its conclusion that the surety had not engaged in the business of insurance, made a telling observation:  "By limiting the scope of article 21.21 to the business of insurance, the Legislature intended it to apply to a species of economic enterprise, not to particular contracts on a piecemeal basis."  *Dallas Fire Ins. Co.*, 2004 WL 2913657, at *2.  In the case at bar, there is no evidence that UACL has entered into other contracts to provide insurance.  Rather, the only owner-operator/UACL lease before the Court is the Agreement between UACL and Tayssoun.  This one contract does not meet Tayssoun's burden to raise a genuine fact issue that UACL is in the business of insurance.[19]

In sum, the Court concludes that there is no basis to hold on the summary judgment record that UACL entered into an insurance contract with Tayssoun or that UACL was in the business of insurance in dealings with Tayssoun.  Thus, Tayssoun cannot state a claim upon which relief can be granted under Article 21.21 of the Texas Insurance Code.  Dismissal of Tayssoun's Article 21.21 claims is required.

---

[19]     Tayssoun points out that UACL objected to the request to produce other owner-operator leases.  Tayssoun had the opportunity to move to compel production of documents it deemed relevant or discoverable, and did not do so.  It is too late to do so after the discovery period is closed and motions for summary judgment have been filed.

There accordingly is no reason to reach the questions of whether Article 21.21 is preempted by federal law, whether Tayssoun has standing to sue under Article 21.21, or whether Tayssoun has alleged damages cognizable under Article 21.21, and the Court declines to do so.

**B.**     **Legal Viability of Tayssoun's "False Charges" Claims**

Tayssoun asserts that, under 49 U.S.C.§ 14704(b), it may recover for shipping rate overcharges in violation of 49 U.S.C. §§ 13702, 13708.  UACL contends that only shippers of goods in "noncontiguous domestic trade" or shippers of "household goods" may rely on § 14704(b).  That section provides:

> **Liability and damages for exceeding tariff rate**. — A carrier providing transportation or service subject to jurisdiction under chapter 135 is liable to a person for amounts charged that exceed the applicable rate for transportation or service contained in a tariff in effect under section 13702.

The Court agrees with UACL and holds that Tayssoun may not rely on § 14704(b) because UACL is not a carrier with "a tariff in effect under Section 13702."  Section 13792 states that a carrier that provides transportation (1) "in noncontiguous domestic trade," or (2) "for movement of household goods" must have a tariff in effect.  "Noncontiguous domestic trade" is transportation "involving traffic originating in or destined to Alaska, Hawaii, or a territory or possession of the United States."  49 U.S.C. § 13102(15).  "Household goods" are "personal effects and property used or to be used in a dwelling."  49 U.S.C. § 13102(10).  Carriers that ship household goods are commonly referred to as "moving companies."  In the

trucking industry, carriers of goods in noncontiguous domestic trade are known as "water carriers."

Tayssoun claims—without any linguistic or judicial decision support—that § 14704(b) applies to all charges that exceed tariff rates, not merely to charges that exceed tariffs in effect under § 13702. This argument is without merit.[20] Section 14704(b) allows a right of action only against carriers of household goods and carriers of goods in noncontiguous domestic trade. It is undisputed that UACL is neither. Therefore, Tayssoun's false charges claim under § 14704(b) fails.[21]

## C.   Private Right of Action for Violations of Truth-in-Leasing Regulations

Tayssoun brings claims against UACL pursuant to various provisions within 49 C.F.R. Part 376 (2003), known as the "Truth-in-Leasing regulations." Tayssoun relies on 49 U.S.C. § 14704(a)(2) for its authority to assert these claims. UACL contends that

---

[20]   In 1995, in connection with the Interstate Commerce Commission Termination Act ("ICCTA"), "Congress found that motor carriage had become a 'mature, highly competitive industry where competition disciplines rates far better than tariff filing and regulatory intervention,' and that rate regulation was no longer necessary except for '[two] specialized categories of trucking operations'": household goods and noncontiguous domestic trade. *The Munitions Carriers Conference v. United States*, 147 F.3d 1027, 1029 (D.C. Cir. 1998) (quoting S.Rep. No. 104-176, at 10 (1995)). "Congress then enacted a new statutory scheme under which a carrier need file tariffs only for the transportation of household goods [and certain noncontiguous domestic trade], as to which preferential treatment is still prohibited." *Id.*; *cf. Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000) (noting that ICCTA "abolished the tariff filing requirement and the filed-rate doctrine, and it cancelled the legal effectiveness of most extant tariffs").

[21]   Because Tayssoun cannot sustain its claim under § 14704(b), the Court does not reach the issues UACL raises regarding whether that section applies to parties other than shippers, or whether a plaintiff under that section can recover damages for charges the plaintiff has not paid.

§ 14704(a)(2) does not grant a private right of action for violations of the Truth-in-Leasing regulations, and that Tayssoun has not met the heavy burden to show Congress intended to create an implied right of action.

The Interstate Commerce Commission Termination Act of 1995 ("ICCTA") transferred the authority to regulate interstate motor carriers from the Interstate Commerce Commission ("ICC") to DOT and the Surface Transportation Board. *See* 49 U.S.C. § 13501. Pursuant to this authority, the Federal Highway Administration within DOT administers and enforces the Truth-in-Leasing regulations. The regulations impose requirements and prohibitions on lease agreements between motor carriers and owner-operators in the trucking industry. *See generally* 49 C.F.R. Part 376. A primary goal of the Truth-in-Leasing regulations is to prevent large carriers from taking advantage of owner-operators' inferior bargaining position. *Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 367 F.3d 1108, 1110 (9th Cir. 2004). The ICC explained that the purpose of the regulations is:

> to promote truth-in-leasing – a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; . . . to eliminate or reduce opportunities for skimming and other illegal or inequitable practices [by motor carriers]; and . . . to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

*Lease and Interchange of Vehicles,* 131 M.C.C. 141, 142 (1979).

Section 14704 of the ICCTA is entitled "Rights and remedies of persons injured by carriers or brokers." Section 14704(a)(2) provides:

> **Damages for violations**. – A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages

> sustained by a person as a result of an act or omission of that carrier or broker
> in violation of this part.

49 U.S.C. § 14704(a)(1).  Both parties agree that UACL is a carrier subject to jurisdiction under Chapter 135.  The dispute here concerns whether a violation of the Truth-in-Leasing regulations, specifically, 49 C.F.R. § 376.12, constitutes a violation of 49 U.S.C. § 14704(a)(2).  Tayssoun argues that §14704(a)(2) creates an express — not implied — private right of action to remedy violations of the Truth-in-Leasing regulations.  UACL argues that § 14704(a)(2) must be read with § 14704(a)(1) as limited to actions to enforce agency orders.  Under subsection (a)(1):

> A person injured because a carrier or broker providing transportation or
> service subject to jurisdiction under chapter 135 does not obey an order of the
> Secretary or the Board, as applicable, under this part, except an order for the
> payment of money, may bring a civil action to enforce that order under this
> subsection.  A person may bring a civil action for injunctive relief for
> violations of sections 14102 and 14103.

49 U.S.C. § 14704(a)(2).  In support of its argument that subsection (a)(2) is limited to actions to enforce agency orders and to injunctive relief pursuant to such orders, UACL relies on *Renteria v. K&R Transp., Inc.*, 1999 WL 33268638, at *6 (C.D. Cal. Feb. 23, 1999) (declining to find private right of action for violations of § 14704(a)(2)), which in turn discusses the House Report in connection with the ICCTA's partial deregulation of the carrier industry.  That Report states:

> section [14704] provides for private enforcement of the provisions of this
> Motor Carrier Act in court.  This expands the current law which only permits
> complaints brought under the Act to be brought before the ICC.  This section
> provides that an injured person may bring a civil action to enforce an order of
> the Secretary or the Panel under this part.  This section also provides that

complaints brought to enforce the motor carrier leasing and lumping rules may also seek injunctive relief.

H.R. Rep. No. 104-311, at 120-21 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 832-33. UACL argues the House Report clearly contemplates the continued existence of agency orders on claims for damages, and makes no mention of bringing an action for damages without such an order.  UACL also asserts that Congress intended to give a party the ability to bring a civil action under § 14704(a)(2) only to obtain damages for the violation of an agency order.  UACL argues that the structure and interrelationship of §§ 14704 and 14705 bolster the conclusion.  There is no statute of limitation for actions under § 14704(a)(2), while other claims under § 14704 do have statutes of limitation.[22]  The Court is unpersuaded. As noted, § 14704(a)(2) provides generally for actions by "persons" against carriers regulated under Chapter 135 (the chapters of the United States Code governing federal jurisdiction over motor carriers engaged in various types of transportation of passengers, property or both) for "damages sustained by a person as a result of an act or omission of that carrier . . . in violation of this part."  Section 14705(b) sets an eighteen month time limit for "civil actions to recover overcharges . . . after the claim accrues."[23]  To the extent Tayssoun's

---

[22]    UACL points out that § 14704(b) creates a private right of action for exceeding tariff rates, and § 14705(c) restricts the time in which such actions can be brought; § 14704(c)(1) allows individuals to file a complaint with an agency, and § 14705(b) imposes a time limitation on such complaints; and §§ 14704(a)(1) and (c)(2)(B) grant a private right of action to enforce agency orders, and § 14705(e) imposes a corresponding time limitation.

[23]    Section 14705(b) provides:

> A person must begin a civil action to recover overcharges within 18 months
>                                                                 (continued...)

§ 14704(a)(2) claims are for overcharges asserted by UACL, the claims fit within the limitations rule of § 14705(b).[24] "In any event, as other courts have noted, the absence of a specific statute of limitations is not dispositive of Congressional intent, in light of Congress' creation of a default limitations period of four years." *Owner-Operator Indep. Drivers Assn., Inc. v. Bulkmatic Transp. Co.,* 2004 WL 1151555, at *3 (N.D. Ill. May 3, 2004) (concluding that limitations period for section 14704(a)(2) Truth-in-Leasing claim is four years); 28 U.S.C. § 1658 (instituting default statute of limitations of four years for all damages where the limitations period is not specifically set forth in the respective legislation); *see also Fitzpatrick v. Morgan Southern, Inc.*, 261 F. Supp. 2d 978, 986 (W.D. Tenn. 2003) (concluding that section 14704(a)(2) Truth-in-Leasing claim was subject to two year statute of limitation, based on reasoning that section was drafted in error).

Moreover, UACL's arguments prove too much.  The logical result of UACL's argument is that because § 14704(a)(2) is not associated with a time limit, that provision does not contain *any* right of action.  Because Congress would not enact a meaningless provision of law, § 14704(a)(2) clearly provides a private right of action for *something*, the question is what Congress intended when it created a remedy for damages sustained as a result of

---

[23]     (...continued)
          after the claim accrues.  If the claim is against a carrier providing transportation subject to jurisdiction under chapter 135 and election to file a complaint with the Board or Secretary, as applicable, is made under section 14604(c)(1), the complaint must be filed within 3 years after the claim accrues.

[24]     The Court holds, for reasons explained below, that Tayssoun's claims are cognizable under § 14704(a)(2).

action "in violation of this part."   In the same House Report quoted above, the House

Transportation and Infrastructure Committee explained:

> [T]he ICC currently resolves [carrier] disputes . . .. There is no explicit
> statutory requirement to do so . . ..  The ICC dispute resolution programs
> include household goods and auto drive away carriers, brokers, owner-operator
> leasing, loss and damage claims, duplicate payments and overcharges, and
> lumping.
>
> The bill transfers responsibility for all the areas in which the ICC resolves
> disputes to the Secretary (except passenger intercarrier disputes).  *The
> Committee does not believe that DOT should allocate scarce resources to
> resolving these essentially private disputes, and specifically directs that DOT
> should not continue the dispute resolution functions in these areas.  The bill
> provides that private parties may bring actions in court to enforce the
> provisions of the Motor Carrier Act.*  This change will permit these private,
> commercial disputes to be resolved the way that all other commercial disputes
> are resolved – by the parties.

H.R. REP. NO. 104-311, at 87-88 (1995), *reprinted in* 1995-2 U.S.C.C.A.N. 793, 799-800

(emphasis added).   Given this clear congressional mandate, the Court rejects UACL's

argument that § 14704(a)(2) pertains only to damages associated with violations of agency

orders.  Rather, the statute provides for a private right of action for claims by persons injured

by carriers through violations of the provisions of Part B of the Transportation Code, which

governs motor carriers and others. *See* 49 U.S.C.A. Part B, § 13101 *et seq.*

UACL also argues that the creation of a private right of action under § 14704(a)(2)

renders the private right of action provisions of § 14704(c)(1) surplusage, violating a primary

cannon of statutory construction.   Section 14074(c)(1) provides for the right to bring

administrative proceedings, as well as the right to bring a civil action, against a carrier to

enforce liability for rate overcharges in violation of § 14704(b).  While this right to bring a

civil suit overlaps to a limited extent with Congress's broad provision for private suits under § 14704(a)(2), it was within Congress's discretion to grant general authority to file a civil suit for other violations under the statute or regulations separate from claims for rate overcharges.  In any event, another primary cannon of statutory construction is that a court must follow the unambiguous language of the statute.  *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Nothing in the text of § 14704(a)(2) supports UACL's position that the section merely creates grounds to complain to a government agency, or merely allows a civil action for damages for violation of an agency order.[25]

The conclusion that § 14704(a)(2) expressly provides for a private right of action comports with the Eighth Circuit's decision in the leading case of *Owner-Operator Independent Drivers Association v. New Prime, Inc.*, which reasoned that "the most logical reading of the language of  § 14704(a)(2) is that it authorizes private parties to sue for damages for carrier conduct 'in violation of [regulations promulgated under] this part.'" 192 F.3d 779, 785 (8th Cir. 1999) (consolidating owner-operators' appeals in Eighth and Sixth

---

[25]    In any case, minor inconsistencies in the drafting are not surprising given the haste with which the bill was negotiated and enacted.  *See* 141 Cong. Rec. H. 12248, 12259 (Nov. 14, 1995) (statement of Cong. Nadler expressing "dismay with the process and the haste with which this bill was brought . . .. As a member of the Committee on Transportation and Infrastructure, we received a 280-page bill on Thursday night and were asked to review, evaluate, and vote on amendments in 4 days, 4 days to determine how we were going to restructure a body of law that had taken 100 years to develop."); *see also Fitzpatrick v. Morgan Southern, Inc.,* 261 F. Supp. 2d 978, 985 (W.D. Tenn. 2003).

Circuits; rejecting carriers' contention that FHWA was required to exercise primary

jurisdiction over owner-operators' ICCTA claims alleging violations of Truth-in-Leasing

regulations), *cert. denied sub nom.*, *New Prime v. Owner-Operators Indep. Drivers Ass'n*,

529 U.S. 1066 (2000).  This reading makes the most sense because § 14704 itself contains

no limitations or prohibitions.  In declining to read §§ 14704(a)(1) and (a)(2) as dependent

on one another, the *New Prime* court noted that two different bills, H.R. 2539 and S. 1396,

were sent to the conference committee and the committee reorganized the proposed

legislation by joining into one section for the first time the provisions that became §§

14704(a)(1) and (a)(2).  *See New Prime,* 192 F.3d at 784.  The ICCTA Conference Report,

created subsequent to the House Report, makes clear that § 14704(a)(2)

> provides for private enforcement of the provisions of the Motor Carrier Act in
> court. . . .  The ability to seek relief for motor carrier leasing . . . violations is
> in addition to and does not in any way preclude the right to bring civil actions
> for damages for such violations.

H.R. Conf. Rep. No. 104-422, at 221-22 (1995), *reprinted in* 1995-2 U.S.C.C.A.N. at 906-

07.[26]

---

[26]  This conclusion is contrary to the ruling in *Renteria v. K&R Transportation, Inc*., 1999 WL
33268638 (C.D. Cal. Feb. 23, 1999) (refusing to allow private damages action for violations
of Truth-in-Leasing regulations), but *Renteria* has been overruled by implication on this point
by the Ninth Circuit in *Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 367 F.3d
1108, 1110 (9th Cir. 2004) ("When Congress abolished the [Interstate Commerce]
Commission in 1995, it placed enforcement responsibility with the owner-operators by
enacting a statute that provides a private right of action for violations of the Truth-in-Leasing
regulations.").  Accordingly, *Renteria* is not persuasive authority on this point.

UACL also urges that the statute requires Tayssoun to exhaust administrative remedies before it may bring a federal court action.  However, this argument flies in the face of rulings by the Federal Highway Administration ("FWHA") in which it has declined to exercise jurisdiction over private disputes.  The FWHA interprets the ICCTA as providing for private enforcement of the Truth-in-Leasing regulations.  *See New Prime*, 192 F.3d at 781-82; *Renteria*, 1999 WL 33268638, at *5-6.  Although a federal court should not defer to an agency in deciding whether the court's exercise of jurisdiction is proper, *Renteria*, 1999 WL 33268638, at *6, the Court concludes that the FWHA properly declines jurisdiction.

UACL also urges that this district has already held that a similar rail carrier provision, 49 U.S.C. § 1170, does not provide a private right of action.  *See City of Laredo v. Texas Mexico Ry. Co.*, 935 F. Supp. 895, 898 (S.D. Tex. 1996) (Kazen, J.).  *Texas Mexico Railway*, however, concerned the issue of whether removal jurisdiction existed based on complete preemption of state law by the ICCTA.  The court found that there was no complete preemption, based largely on its observation that the ICCTA does not contain explicit language providing for removal jurisdiction of state court actions, and remanded the suit to state court.  *See id*.  Further, UACL's reliance on *dicta* in *Texas Mexico Railway* is undermined by the fact that *Texas Mexico Railway* was decided prior to *New Prime*'s detailed and well-reasoned ruling recognizing a private cause of action under the ICCTA.  *See New Prime, Inc.*, 192 F.3d at 780-81.  Subsequent to *New Prime*, courts have uniformly interpreted § 14704(a)(2) as providing for a private right of action without the necessity of prior agency adjudication.  *See Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*,

325 F. Supp.2d 1252, 1264 (D. Utah 2004) ("[T]he Court will follow *New Prime* and hold that Plaintiffs were not required to obtain an administrative order prior to instituting suit[, and] that there is a private right to sue."); *Owner-Operator Indep. Drivers Ass'n v. Bulkmatic Transport Co.,* 2004 WL 1151555, at *3 (N.D. Ill.) (following *New Prime*); *Fitzpatrick v. Morgan Southern*, Inc., 261 F. Supp. 2d 978, 981 (W.D. Tenn. 2003) (same); *Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit Inc.,* 161 F. Supp. 2d 948, 955 (S.D. Ind. 2001) ("[W]e agree with the FHWA and with the Eighth Circuit that 49 U.S.C. § 14704(a) appears *on its face* to provide for a private right of action for damages and injunctive relief by parties injured by a carrier."); *Owner-Operator Indep. Drivers Ass'n v. Arctic Exp., Inc.*, 87 F. Supp. 2d 820, 832 (S.D. Ohio 2000) (following *New Prime*); *see also Owner-Operator Indep. Drivers Ass'n v. Swift*, 367 F.3d 1108, 1110 (9th Cir. 2004) (stating that Congress "placed enforcement responsibility with the owner-operators by enacting a statute that provides a private right of action for violations of the Truth-in-Leasing regulations").

The text of § 14704(a) provides an express cause of action for violations of the Truth-in-Leasing regulations and UACL's contentions to the contrary are rejected.  Tayssoun may proceed with its claims of violations of the Truth-in-Leasing regulations**.**

## V.    TAYSSOUN'S SUMMARY JUDGMENT MOTION ON ITS OWN CLAIMS

Tayssoun moves for summary judgment on its own claims that the Agreement violated federal Truth-in-Leasing regulations and on several issues pertaining to its Article 21.21 claims.

A.    **Truth-in-Leasing Regulation Claims**

Tayssoun argues as a matter of law that the Agreement, which UACL drafted, violates federal Truth-in-Leasing regulations in several respects.  The Truth-in-Leasing regulations govern leases and the interchange of motor vehicles.  These regulations appear as subpart B of Part 376 of Title 49 of the Code of Federal Regulations.  The Court agrees with Tayssoun that there are violations of certain regulations but holds that summary judgment in Tayssoun's favor is not appropriate at this time  under these regulations.  Tayssoun still must prove the damages to which it is entitled; this is an issue for trial.

1.    **Method of Computing Cargo Insurance Charge-Backs**

Tayssoun points out that the "per trip fee" for the insurance UACL promised to provide was variable but that there is no means within the Agreement to determine the amount UACL was entitled to charge for each specific load of cargo and trip.  Exhibit B to the Agreement provides that UACL will deduct from Tayssoun's compensation "[a] fee of $5.00 per trip, not to exceed 1%, but not less than $1.50 per load . . . for cargo insurance."  Agreement, Exh. B, ¶ 1.  This clause is incomprehensible.  The provision states that a $5.00 fee will be charged per trip, but then establishes a range—apparently a minimum of "$1.50 per load" and a maximum of 1% of some unspecified sum.

To the extent the fee was used to defray the cost of a specific item purchased by UACL for use by (or for the benefit of) Tayssoun, the Truth-in-Leasing regulation codified as 49 C.F.R. § 376.12(h) applies.  Section 376.12(h) provides:

Charge-back items.  The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed.  The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

This requirement is designed to allow owner-operators, like Tayssoun, to determine whether a per trip fee being charged is fair.  Under these assumptions, UACL's failure to do so is a violation of § 376.12(h).  *See Owner-Operator Independent Drivers Ass'n, Inc. v. Ledar Transport*, 2000 WL 33711271, at *7 (W.D. Mo.) (carrier's list of items was insufficient to satisfy 376.12(h) because agreement did not recite how each deductible item would be computed); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Rocor Int'l, Inc.,* No. CIV-98-846-L, slip op. at 6 (W.D. Okla. July 19, 2000) (carrier's weekly $35 charge-back of owner-operator compensation for insurance premiums violated § 376.12(h) because carrier failed to provide documents necessary to determine validity of the charge).[27]

If UACL in fact used the money generated from Tayssoun's trip fee payments to pay the cost of the Cargo Policy, then UACL was required by § 376.12(h) to recite in the Agreement with specificity how the deduction would be computed, and to provide Tayssoun with copies of the documents necessary to determine the charge's validity.  UACL did neither.

_____

[27]    In fact, the Cargo Policy was merely a fronting policy that covered little or nothing on the damage claims UACL paid allegedly arising from Tayssoun's transportation of cargo.  The summary judgment record does not disclose how premiums for the Cargo Policy paid by UACL compare to the monies generated from the $5.00 per trip fee.

To the extent UACL justifies the fee as a cost for different unspecified insurance coverage provided directly or indirectly for the benefit of Tayssoun, UACL was obliged to provide to Tayssoun documents regarding the cost of whatever insurance UACL acquired. UACL did not meet its obligations here.

It appears that, in fact, there was no insurance obtained for the trip fees; instead UACL paid shippers' claims and then deducted monies from the compensation owed to Tayssoun to reimburse itself. If this is what occurred, then UACL has not complied with § 376.12(h). UACL paid shippers' claims without giving Tayssoun documents or a clear advance explanation (in the Agreement or otherwise) of what claims would be paid, how the damages would be computed, and what reimbursement obligations Tayssoun had. The meaning of "deductible" was not made clear, nor was the purpose of the per trip fee. Further, UACL ultimately disclosed to Tayssoun, at best, only some of the settlement information and failed to "afford[] copies of those documents which are necessary to determine the validity of the charge." Finally, to the extent UACL contends that there was no insurance to cover Tayssoun's liability to UACL, and that Tayssoun owes it reimbursement for payment of shippers' damages, these charges by UACL are "initially paid items" that fit within the Truth-in-Leasing regulation on "charge-back items," § 376.12(h). In this regard, UACL violated § 376.12(h) because it did not explain in the Agreement how these charge-backs were computed nor give documents to allow Tayssoun to determine their validity.

2.      **Conditions for Deductions for Cargo Damage**

UACL has not satisfied the requirement that documentation be provided to Tayssoun

before deductions are made.  Section 376.12(j)(3) provides:

> The lease shall **clearly specify** *the conditions under which deductions for*
> *cargo or property damage may be made from the lessor's settlements*.  The
> lease shall further specify that the authorized carrier must provide the lessor
> with a *written explanation and itemization* of any deductions for cargo or
> property damage made from any compensation of money owed to the lessor.
> The written explanation and itemization must be delivered to the lessor *before*
> any deductions are made.

(Emphasis added.)  This Truth-in-Leasing regulation makes clear that owner-operators are

to be given the information necessary to determine whether deductions from their

compensation are valid before the deductions are made.

Tayssoun has established that UACL, over the course of several years, deducted more

than $12,000 from Tayssoun's compensation by withholding monies UACL contends are

"deductibles" to reimburse UACL for shippers' damage claims.  UACL does not argue that

it provided a written explanation and itemization of deductions prior to charging Tayssoun.

In fact, UACL, through its president Donald Cochran, admitted that notification for these

deductions was typically expressed over the telephone.  Further, UACL's initial demand

letter after the termination of the Agreement consisted of a one-page summary merely

breaking the total $765,856.68 demanded in damage charges down into three yearly time

periods, but giving no written itemization.  Tayssoun has established that UACL violated

§ 376.12(j)(3) and UACL has not raised a genuine fact issue on this aspect of Tayssoun's claim.[28]

Because the parties have surviving Truth-in-Lending and breach of contract claims that require trial in this case, the Court also makes the following rulings about the application of § 376.12(j)(3) and the terms of the Agreement. There is an argument that the phrase "unless negligence caused by contractor," violates § 376.12(j)(3) because it does not inform Tayssoun of the conditions under which UACL may make deductions for cargo damage. While the phrase is not grammatically correct and thus is not crystal clear, it can only mean that UACL may deduct the full cost of all cargo damages from Tayssoun's compensation caused by Tayssoun's negligence (or gross negligence). The Agreement thus provides that if Tayssoun is not negligent (or grossly negligent), then UACL is to bear financial responsibility (other than up to $250) for shippers' cargo damage. The Court concludes that the Agreement adequately states conditions for deductions for cargo damages in this manner and does not violate § 376.12(j)(3).

### 3.     Notice of Tayssoun's Need to Obtain Its Own Cargo Insurance

The Agreement does not adequately inform Tayssoun that it needs to obtain cargo insurance to protect itself from liability to UACL arising from cargo damage during

---

[28]     The last sentence in § 11 of the Agreement satisfies § 376.12(j)(3)'s requirement that the lease contain specified language concerning explanations of deductions to be taken for cargo damage. The Agreement states that "Carrier shall provide a written explanation and itemization of any deductions made under this [Section] 11." UACL's violation of this regulation is that UACL did not in fact carry out this promise.

Tayssoun's hauls, and thus the Agreement violates § 376.12 (j)(1).  This provision mandates that a

> lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public . . ..  ***The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment***, such as bobtail insurance.  If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

49 C.F.R. § 376.12(j)(l) (emphasis added).   Tayssoun argues that the Agreement fails to specify that the cargo insurance for which UACL charged Tayssoun runs for the benefit of the public and shippers, not Tayssoun.  This argument is off the mark.  The issue is not who must purchase the Cargo Policy or other insurance for the benefit of the public and shippers, which under the Agreement is the responsibility of UACL.  *See* Agreement, § 11.  The issue is whether the Agreement identifies who is responsible for providing the cargo insurance referenced in ¶ 1 of Exhibit B that is to be obtained in exchange for the $5.00 per trip fee.[29]  The Agreement fails to make this disclosure and thus fails to "specify who is responsible for providing any other insurance coverage for the operation of the leased equipment," as required by § 376.12(j)(1).[30]  The Agreement's lack of specificity caused a misunderstanding

---

[29]   The Agreement specifies Tayssoun's obligation to obtain bobtail insurance and UACL's obligation to maintain legally mandated cargo insurance to compensate the public.  Agreement, § 11.

[30]   There is a serious argument that UACL's imposition of a mandatory $5.00 per trip fee as a purported charge for "cargo insurance" is confusing, if not deceptive.  UACL admits it obtained no insurance to cover Tayssoun's obligations.  The vague description of the purpose
(continued...)

by Tayssoun.  The Agreement failed to inform Tayssoun that it lacked cargo insurance to cover its obligation to compensate UACL for shippers' cargo damage claims that UACL paid.  This Truth-in-Leasing violation is significant because Tayssoun shipped millions of dollars' worth of cargo while operating under the false impression that it had purchased cargo insurance that would provide it benefits if shippers' cargo was damaged.

### 4.    Right to Information: Purchase of Cargo Insurance From UACL Was Not Compulsory

Tayssoun also argues that the Agreement violates Truth-in-Leasing regulation § 376.12(i) because the Agreement fails to specify that Tayssoun is not required to purchase cargo insurance from UACL as a condition of entering the lease Agreement.  Under § 376.12(i), a lease must "specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement."  UACL responds that ¶ 9 of the Agreement meets this obligation. Section 9 provides:

> In the event that the Carrier is requested by the Contractor to extend credit to the Contractor or furnish *gasoline, diesel fuel, oil, anti-freeze, tires, tubes, filters, or any other services or materials*, Contractor will be charged for such services or materials and such charges may be deducted from monies owed the Contractor under this agreement.  In the event that the Carrier is requested by the Contractor to furnish or replace any special or extra equipment, the full amount of cost of said special or extra equipment plus installation charges shall be deducted from any monies owed to the Contractor under this

---

[30]    (...continued)
of the $5.00 per trip fee nevertheless gives the reasonable impression that Tayssoun would enjoy the benefits of some sort of cargo insurance to cover its financial obligations to UACL.

agreement.  ***However, Contractor is not required to purchase or rent any products, equipment or services from the Carrier***.  Carrier assumes no responsibility to Contractor or to third persons for any such service, materials or equipment, or for the use of the Carrier's repair facilities.

Although this paragraph contains the literal language mandated by § 376.12(i) and communicates generally that Tayssoun is not required to purchase tangible items, such as repair parts or services from UACL, Exhibit B expressly imposes on Tayssoun the obligation to pay to UACL $5.00 per trip to purchase cargo insurance from some unspecified source.[31] *See* Agreement, Exh. B, ¶ 1.  The cargo insurance to which this provision refers—whatever the insurance may be—is a "service" to be provided to Tayssoun by (or through) UACL, the carrier.  Thus, the Agreement violated § 376.12(i) because there is no mention in Exhibit B, ¶ 1, or elsewhere in the Agreement that the "cargo insurance" to be obtained for the $5.00 per trip fee was not mandatory.  Tayssoun is correct that the Agreement violates § 376.12(i) because the Agreement made the purchase of cargo insurance for the $5.00 per trip fee mandatory.

The Court does not definitively determine what cargo insurance policy the parties intended to refer to in ¶ 1 of Exhibit B.  UACL argues that this clause refers to the Cargo Policy—insurance for the benefit of shippers and the public, not Tayssoun.[32]  However, the Agreement § 11 provides that UACL "shall maintain at its own expense public liability damage and cargo insurance coverage as concerns shippers and the general public," and that

---

[31]    The Agreement does not make clear what this fee is actually for.

[32]    Independent of the foregoing, to the extent UACL contends that the $5.00 per trip fee was mandatory and was reimbursement for UACL's Cargo Policy premium, the provision fails to satisfy § 376.12 in other respects, as discussed elsewhere in this opinion.

Tayssoun is required to reimburse certain deductibles.  It says nothing about Tayssoun paying UACL for the premiums on that insurance.  There is no linguistic support in the Agreement (or Exhibit B) for UACL's contention here.  To the extent UACL did not intend to obtain, or itself provide, cargo insurance for Tayssoun in exchange for the $5.00 per trip fee, there is, as noted earlier, a serious question whether UACL breached the Agreement with Tayssoun or deceived Tayssoun. Because the parties each provide a cogent interpretation of the phrase "for cargo insurance" in Exhibit B, ¶ 1, the Court holds that the Agreement is ambiguous to this limited extent.  *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998); *see also Cicciarella*, 66 F.3d at 768 ("A contract is ambiguous only 'when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning.'" (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983))).  The parties' intentions in this regard are issues for trial.

### 5.    Right to Copies of the Applicable Insurance Policies and Certificates of Insurance

Tayssoun claims that the Truth-in-Leasing regulations required UACL to notify Tayssoun of its right to copies of the Cargo Policy and the certificate of insurance for that policy.  UACL counters that Tayssoun did not purchase any cargo insurance, so it therefore was not required to provide Tayssoun with any information regarding the Cargo Policy that UACL purchased for itself to compensate shippers in the event that it was unable to pay claims on its own.  Under § 376.12(j)(2):

If the lessor purchases any insurance coverage for the operation of the leased equipment from or through the authorized carrier, the ***lease shall specify*** that the authorized carrier will ***provide the lessor with a copy of each policy upon the request*** of the lessor.  Also, where the lessor purchases such insurance in this manner, the ***lease shall specify*** that the authorized carrier ***will provide the lessor with a certificate of insurance*** for each such policy.  Each certificate of insurance shall include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the lessor for each type of coverage, and the deductible amount for each type of coverage for which the lessor may be liable.

UACL is correct that Tayssoun was not a named party to the Cargo Policy.  However, that conclusion does not resolve the issue here.  UACL routinely charged Tayssoun a fee akin to an insurance premium, namely, the $5.00 per trip fee "for cargo insurance," in ¶ 1 of Exhibit B.  UACL therefore had an obligation to inform Tayssoun that it had a right to see "a copy of each policy upon the request of the lessor," 49 U.S.C. § 376.12.(j)(2), as well a copy of the "certificate of insurance for each such policy," which certificate was to include "the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the lessor for each type of coverage, and the deductible amount for each type of coverage for which the lessor may be liable."  *Id*.  Regardless whether the "cargo insurance" specified in ¶ 1 of Exhibit B was the Cargo Policy or some other insurance coverage,[33] the Agreement did not make the necessary disclosures about the availability of copies of the insurance policy documents.  Moreover, no such documentation was ever given to Tayssoun.  Tayssoun thus has shown a violation of § 376.12(j)(2).[34]

---

[33]     *See supra* pages 45-46.

[34]     While there may be a fact issue as to whether Tayssoun would have actually requested a copy
(continued...)

Tayssoun paid more than $34,400 in trip fees to UACL "for cargo insurance."  Had UACL informed Tayssoun in the Agreement of its right to request a copy of the policy for whatever insurance policy UACL intended to provide, as well as the certificate of insurance, much of this controversy might have been avoided.  To the extent UACL intended to refer in ¶ 1 to the Cargo Policy, disclosure of the right to the information required by § 376.12(j)(2) would have informed Tayssoun of its right to ask for the policy, and allowed Tayssoun to discover that the Cargo Policy was a fronting policy and that UACL therefore likely would seek greater reimbursement than otherwise expected.  Alternatively, to the extent there was no insurance at all, Tayssoun would have been able to ascertain the true facts and protect its interests accordingly.

### 6.    Thirty-Day Limit on Asserting Claims

UACL urges that the Agreement bars Tayssoun from asserting its claims because the Agreement contains a thirty-day time limit in ¶ 4 of Exhibit B, which provides:

> It is understood that in the event of any dispute by contractor concerning compensation, it is understood that any such claim shall be presented in writing within thirty (30) days from the occurrence [*sic*] giving rise to such

---

[34]    (...continued)
of the cargo insurance policy referred to in ¶ 1 of Exhibit B, as required in § 376.12(j)(2), that section also requires that UACL in the Agreement tell Tayssoun of its right to a copy of the certificate of insurance.  Because this regulation does not mandate that the owner-operator be told it must "request" a copy of the certificate in order to see it, in contrast to the provision pertaining to the insurance policy itself, the Court concludes that UACL had an obligation to provide that certificate of insurance to Tayssoun irrespective of Tayssoun's specific request for the document.

claim.  Failure to submit a claim within a thirty (30) day period, shall preclude any such claim from being presented by the contractor.

The issue here is when the thirty day period begins for the dispute presented.  The phrase "from the occurrence giving rise to such claim" adopts parlance used in the insurance industry to refer to accidents and events causing damages for which insurance coverage is sought.  This clause makes sense in the context of limiting the time a shipper (rather than an owner-operator) has to assert a claim for cargo damage.  However, in the carrier/owner-operator context, the clause is confusing and difficult to construe.   The issues are what the term "occurrence giving rise to the claim" means and when a "dispute" exists.

UACL argues that the term occurrence refers only to the accident or events giving rise to the shipper's claim for cargo damages.  Tayssoun disagrees with this construction as applied to the dispute presented in this suit.  Under the Agreement and federal regulations, a shipper must assert its claim for cargo damage, loss or delay against the carrier, here, UACL; there is no provision in the Agreement for notice to owner-operator Tayssoun of the shipper's claim.  Tayssoun sues under the Truth-in-Leasing regulations to prevent UACL from deducting from Tayssoun's compensation for shippers' damages that UACL in late February and mid-March 2004 informed Tayssoun that UACL had paid.[35]  In these demands, UACL also seeks to deduct sums to cover unpaid but pending claims of shippers.  This dispute between UACL and Tayssoun arose only when UACL, after termination of the

---

[35]      Tayssoun alleges that UACL made demands on Tayssoun on February 24, 2004 and March 17, 2004 for reimbursement of $765,856.68 in cargo damage claims.  Second Amended Complaint, ¶ 10 & Exhibits 1 and 2.

Agreement,[36] stated it would make these deductions from Tayssoun's final compensation. UACL now argues that these cargo claims were caused by Tayssoun's performance under the Agreement and thus are Tayssoun's responsibility.  This dispute and the occurrence "giving rise to the claim" concern UACL's conduct, not the shippers' claims *per se*.  Thus, the thirty-day time limit did not commence until UACL's demand.  This suit was filed on March 19, 2004, within thirty days of UACL's first demand.  It is unclear whether the thirty-day time limit in ¶ 4 of Exhibit applies to the present circumstances at all, but if it does, the phrase "occurrence giving rise to the claim" refers to UACL's February and March 2004 assertions of its right to deduct sums from Tayssoun's final compensation.[37]

Additionally, UACL's contention—the thirty-day period begins at the time of the incident during the cargo transportation giving rise to the damages paid by UACL to the shipper—is not plausible unless the Court implies a requirement in the Agreement that UACL give Tayssoun notice of a shipper's claim and of UACL's intention to pay a shipper's claim.  Only then, with notice of a shipper's claim from UACL, can Tayssoun gather information about the underlying events on which the shipper's damages are claimed. Further, only when UACL informs Tayssoun of the intention to pay a specified amount on

---

[36]      The Agreement was terminated on February 11, 2004.  Second Amended Complaint, ¶ 9.

[37]      UACL may not make a deduction from Tayssoun's compensation for "charge-back items" that "may be initially paid for by the . . . carrier" unless the lease clearly specifies all such items.  49 C.F. R. § 376.12(h). To the extent UACL now claims that Tayssoun is in fact responsible for the damages to shippers, and that UACL has paid only on Tayssoun's behalf, UACL must satisfy § 376.12(h).  To the extent these claims could be construed as charge-back items, UACL has failed to comply with this regulation.

a claim can Tayssoun be in a position to give notice to UACL of a dispute about Tayssoun's

alleged negligent conduct and UACL's handling of the claim.[38]  Where a contract omits a

"term . . . essential to a determination of the rights and duties of the parties, either because

they failed to foresee the situation which later arises or because their expectations rested on

unarticulated assumptions," the court may supply "a term which is reasonable in the

---

[38]     UACL in some instances charged Tayssoun for incidents of damage, delay, or loss. Generally, the charge was $250; however, sometimes the charge was less and occasionally more. When $250 or less was charged, UACL signaled that it was charging Tayssoun the "deductible" and that UACL was not claiming Tayssoun had been negligent. Thus, when UACL charged $250 or less, there was no indication at that time that UACL intended ever to require Tayssoun to pay the entire claim.

Alternatively UACL's construction of ¶ 7 of Exhibit B is unconscionable. The Court will not enforce the provision as so construed. During the parties' performance of the Agreement, UACL charged Tayssoun $250 or less for numerous shippers' cargo claims. UACL apparently gave Tayssoun virtually no information on these claims during the Agreement. Under a fair reading of the Agreement, as noted above, the charge of $250 (or less) indicated that UACL had determined that there was no negligence (or gross negligence) by Tayssoun. If UACL deemed Tayssoun negligent (or grossly negligent) in a particular incident, UACL had authority under the Agreement, Exhibit B, ¶ 7, to require Tayssoun to pay the full claim. UACL had an implied obligation to inform Tayssoun of UACL's clarification of those claims and to charge Tayssoun accordingly in a timely manner. In this connection, the Agreement specified that UACL "shall provide a written explanation and itemization of any deductions made under [Section] 11." Had UACL done so, Tayssoun would have had the necessary documentary information to verify the claims asserted by the shippers and paid by UACL. Tayssoun could have investigated and disputed UACL's characterization, or the amount of damages UACL proposed to pay the shipper, closer in time to the underlying events. As to the events for which Tayssoun was charged $250 or less, Tayssoun had no reason to investigate or challenge UACL's determinations. It would be unconscionable to enforce the thirty-day time limit as UACL urges. RESTATEMENT (SECOND) CONTRACTS, § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."); *Walton v. Hoover, Bax & Slovacek, L.L.P.*, 149 S.W.3d 834, 842-43 (Tex. App.–El Paso 2004, pet. filed) (a court may refuse to enforce an unconscionable clause of a contract).

circumstances." *Nat'l Audubon Society, Inc. v. Watt*, 678 F.2d 299, 310 (D.C. Cir. 1982); *see, e.g., Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1325 (9th Cir. 1983) (in the absence of an express agreement, the law implies agreement on a reasonable contract price.); *William B. Tanner Co. v. Sparta-Tomah Broadcasting*, 716 F.2d 1155, 1159 (7th Cir. 1983) (when a contract does not specify a time for a party's performance, a reasonable time must be implied); *see also Citizens Nat'l Bank of Orlando v. Vitt*, 367 F.2d 541, 545 (5th Cir. 1966) (a duty to cooperate is implied in every contract in which cooperation is necessary for performance of the contract); *Bank One, Texas v. Stewart*, 967 S.W.2d 419, 434 (Tex. App. – Houston [14th Dist.] 1998, pet. denied) (same).   In any event, UACL's construction of the provision flies in the face of § 376.12(h), which requires a detailed explanation of the sums UACL seeks to deduct from Tayssoun's compensation.   Accordingly, the Court rejects UACL's contention that the thirty-day time limit for Tayssoun to dispute its final compensation expired one month after the underlying occurrences on which the shippers based their claims for damages.

### 7.    Tayssoun's Damages

The parties have not briefed the issue of what type of damages were caused by UACL's violations of federal Truth-in-Leasing regulations.   Nor have the parties addressed the causation standard that applies.   Furthermore, the Court finds that there are fact issues surrounding the amount of Tayssoun's damages on this claim.   Therefore, at this time, the Court declines to determine damages for UACL's violations of the Truth-in-Leasing

regulations and Tayssoun's claims under those regulations cannot be resolved on summary judgment.

**B.     Tayssoun's Summary Judgment Motion on Insurance Code Claims**

The Court has previously decided that UACL did not sell Tayssoun cargo insurance, and was not engaged in the business of insurance, and that therefore Tayssoun's claims under the Texas Insurance Code Article 21.21 must be dismissed.     Summary judgment in Tayssoun's favor on the Article 21.21 claims is not warranted.  That aspect of Tayssoun's summary judgment motion is denied.

## VI.   TAYSSOUN'S APPLICATION FOR A PRELIMINARY INJUNCTION

Tayssoun seeks to enjoin UACL from use of the Agreement, particularly what it terms the Agreement's "cargo damage insurance scheme," in UACL's dealings with other owner-operators.  Such an injunction cannot be granted because Tayssoun does not have standing to assert a claim for injunctive relief.

For injunctive relief, a plaintiff has standing if she (1) "assert[s] [some] likelihood that she will be subjected to a similar [statutory] violation in the future," or (2) "purport[s] to represent a specific class of individuals that is in danger of discrimination from the defendant." *Shafer v. Army & Air Force Exch. Service*, 376 F.3d 386, 398 (5th Cir. 2004). Tayssoun makes no class action allegations.  It cannot assert claims of non-parties to this litigation.  Nor has Tayssoun alleged that it will be subjected to a similar future violation by UACL, and the evidence negates this possibility.  Tayssoun and UACL no longer have a

business relationship, Tayssoun has entered into a lease with another carrier, and there is no

indication that the parties here are likely to do business together in the future.  There thus is

no chance that UACL might injure Tayssoun through a future statutory violation.  Tayssoun

lacks standing to seek injunctive relief.

Because Tayssoun does not have standing for injunctive relief, the Court need not

reach Tayssoun's argument regarding whether a "reasonable cause" standard of review

applies to injunctions for violations of the Truth-in-Leasing regulations.

## VII.   TAYSSOUN'S MOTION TO DISMISS UACL'S COUNTERCLAIMS

Tayssoun moves to dismiss UACL's counterclaims on the basis that UACL's claims

sound in contract alone, and the allocation of risks in the Agreement put the burden of loss

from cargo damage solely on UACL.

### A.    UACL's Tort Claim Concerns Only the Subject Matter of the Contract

Tayssoun is correct that UACL's counterclaim sounds only in contract.  UACL's

negligence claim is based on Tayssoun's mishandling of cargo.  "As a general rule, the

failure to perform the terms of a contract is a breach of contract, not a tort." *Crim Truck &*

*Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex. 1992), *rev'd on*

*other grounds*, *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212 (Tex.

2002).  As UACL points out, the Texas Supreme Court has stated:

> [*T*]he law . . . implie[*s*] a duty to [*a*] defendant to act with reasonable skill and
> diligence . . . so as not to injure a person or property by his performance [on
> a contract].

> In [*Montgomery Ward & Co. v. Scharrenbeck,* 204 S.W.2d 508 (Tex. 1947), in] failing to repair [plaintiff's] water heater properly, the defendant breached its contract.   In burning down plaintiff's home, the defendant breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort.

*Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).  However, the *DeLanney* court went on to state, "[i]n determining whether the plaintiff may recover on a tort theory, it is . . . instructive to examine the nature of the plaintiff's loss.  When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."  *Id*.  This means that "when a party must prove the contents of its contract and must rely on the duties created therein, the action is 'in substance an action *on the contract*, even though it is denominated an action for negligent performance of the contract.'"  *Id*. at 496 (Gonzalez, J., concurring) (emphasis in original).

In the instant case, it is clear that allocation of responsibility for cargo damage is a central subject of the Agreement.  UACL's counterclaims all seek to recover compensation from Tayssoun for sums paid to shippers for cargo damages.  These claims inherently rely on the parties' contract itself.  The only basis for recovery is the Agreement, which charges Tayssoun with a duty not to damage the cargo.  Thus, UACL's counterclaim sounds in contract alone and tort claims or allegations will be dismissed.

**B.**     **UACL's Counterclaim Alleging Breach of Contract Cannot Be Dismissed**

Tayssoun moves to dismiss UACL's breach of contract counterclaim on the ground that responsibility for losses from cargo damages was allocated to UACL with the provision

of insurance in the contract.  This Court has previously held as a matter of law that the Agreement did not create an arrangement whereby UACL provided insurance to Tayssoun. Tayssoun also claims that the events giving rise to legitimate cargo damage claims are not themselves breaches of contract.  This is incorrect because the Agreement clearly imposes a duty on Tayssoun to refrain from damaging the transported cargo.  Thus, dismissal on the ground Tayssoun asserts is denied.  The Agreement allocated certain responsibility for damages to Tayssoun.  There is a genuine dispute about whether Tayssoun has fully performed.

## VIII. UACL'S SUMMARY JUDGMENT MOTION ON TAYSSOUN'S AFFIRMATIVE DEFENSES TO UACL'S COUNTERCLAIMS

UACL moves for summary judgment on Tayssoun's affirmative defenses to UACL's counterclaims.  In its affirmative defenses, Tayssoun asserts, as in its motion to dismiss, that UACL's negligence counterclaim sounds in contract alone, and that it is not a breach of contract to cause cargo damage claims.  The Court has previously held that UACL's negligence counterclaim is not legally viable.  The Court also concludes that UACL may proceed on its breach of contract claim.[39]  Thus, to the extent UACL's motion for summary judgment seeks dismissal of Tayssoun's affirmative defense to UACL's negligence counterclaim, the motion is denied as moot because UACL's negligence claim is dismissed.

UACL also seeks summary judgment dismissing Tayssoun's affirmative defense of

---

[39]     The Court, of course, does not imply anything as to the merits or UACL's likelihood of success on that claim.

fraud to UACL's contract claims.  That motion is denied.  Tayssoun asserts a fraud-in-the-inducement theory as a bar to UACL's counterclaim for breach of contract.  Tayssoun does not assert fraud as an independent ground for recovery over and above the funds held by UACL that Tayssoun claims is due and owing as its compensation earned under the Agreement for transportation of cargo.[40]  UACL argues that Tayssoun does not allege that UACL made any statements or other communication that fraudulently induced it to enter the Agreement, that the Agreement itself contains no misrepresentations, and that, in any event, fraud cannot be based on alleged misrepresentations that are the terms of the contract.  The Court is not persuaded.  Support contrary to UACL's position is found in the Texas Supreme Court stated in the case that UACL cites on this point, *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591 (Tex. 1992), *rev'd on other grounds*, *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212 (Tex. 2002). The Texas Supreme Court long has recognized that "when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Id.* (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex. 1971); *Lone Star Steel Co. v. Scott,* 759 S.W.2d 144, 155 (Tex. App. –Texarkana 1988, writ denied)).[41]

---

[40]     Tayssoun did not include fraud in the inducement in its complaints filed within the amendment deadline nor seek leave to amend to add this claim thereafter.   It is now too late to amend to add causes of action in this case.

[41]     In *Spoljaric*, the Texas Supreme Court further explained: "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent

(continued...)

This Court has held that the parties did not enter into an insurer/insured relationship. However, pursuant to the Agreement, UACL purported to charge Tayssoun with premiums and deductibles "for cargo insurance." *See* Agreement, Exh. B, ¶¶ 1, 7.  Tayssoun argues with some force that these provisions should be read as a promise by UACL to provide Tayssoun with cargo insurance.  Since UACL admits that it did not obtain or provide any such insurance for Tayssoun's benefit, a jury would be permitted to find that UACL's promise in the Agreement to provide cargo insurance to Tayssoun was an intentional falsehood when made.  On the evidence of record, a jury could find that UACL intentionally deceived Tayssoun into believing that it (Tayssoun) had purchased cargo insurance from or through UACL, when UACL had no intention of providing cargo damage coverage for Tayssoun's benefit.  Therefore, Tayssoun's fraud defense will not be dismissed.[42]  UACL's breach of contract claim and Tayssoun's fraud defense require a trial as to the intentions of the parties when they signed the Agreement.

UACL also seeks in passing dismissal of Tayssoun's Truth-in-Leasing-based affirmative defenses to UACL's contract counterclaim.  The Court has previously concluded

---

[41]     (...continued)
acts after the representation is made. *Chicago, T. & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 223, 19 S.W. 472, 474 (1892); *see Smith v. Jungkind,* 252 S.W.2d 596, 599 (Tex.Civ.App.–Austin 1952, writ ref'd).  Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. *See Benoit v. Wilson,* 150 Tex. 273, 281, 239 S.W.2d 792, 796-797 (1951)."  708 S.W.2d at 434.

[42]     The Court also has held that the Agreement is ambiguous in this limited respect.  *See supra* at 46.

that UACL violated certain Truth-in-Leasing regulations.  Thus, Tayssoun's affirmative defenses based on the regulations will not be dismissed and UACL's summary judgment motion is denied in this respect.  The parties have not meaningfully briefed, and thus the Court does not decide, the issue of whether a party may enforce a contract that violates a federal regulation.  That issue, not insignificant, remains in this case.

IX.   **CONCLUSION AND ORDER**

The Court holds the Agreement did not create a relationship in which UACL itself was Tayssoun's cargo insurer and UACL was not in the business of insurance for purposes of the Texas Insurance Code Article 21.21.  The Court accordingly holds that UACL is not subject to liability under Article 21.21.

There is no dispute that the ¶ 1 of Exhibit B to the Agreement authorized UACL to collect a $5.00 per trip fee "for cargo insurance."  UACL in fact collected this fee from Tayssoun for each load of cargo.  The Court holds that this per trip fee was Tayssoun's payment of consideration for a commitment by UACL.  There are, however, fact issues relating to the parties' intentions concerning this commitment, as well as the parties' breach of contract claims and the associated defenses.  The phrase "for cargo insurance" in ¶ 1 of Exhibit B is ambiguous.

Under § 11 of the Agreement and ¶ 7 of Exhibit B thereto, Tayssoun was responsible to UACL for cargo damages caused by Tayssoun's negligence (or gross negligence).  The 30-day time limit for Tayssoun to dispute cargo damage charges asserted by UACL under the Agreement commenced when UACL asserted those charges in February 2004.

Tayssoun's dispute about UACL's right to collect reimbursement for shippers' cargo claims is therefore timely under the Agreement.  UACL's contrary construction of the 30-day time limit in the Agreement is unenforceable.

The Court also concludes that UACL is not a carrier of goods in noncontiguous domestic trade or household goods, and that Tayssoun cannot sustain its claim under 49 U.S.C. § 14704(b).  The Court further holds that 49 U.S.C. § 14704(a)(2) provides a private right of action for violations of federal Truth-in-Leasing regulations, 49 C.F.R. Part 376, and that UACL violated those regulations in various ways.

The Court concludes that Tayssoun does not have standing to obtain a preliminary injunction on its own behalf or on others' behalf.

The Court holds in addition that UACL's counterclaim sounds in contract alone and not tort; UACL may proceed only on its contract claim.  Tayssoun may pursue its breach of contract and Truth-in-Leasing claims, as well as its fraud and Truth-in-Leasing defenses.[43] It is therefore

**ORDERED** that Plaintiff Tayssoun's Motion for Summary Judgment [Doc. # 24] is **GRANTED in part and DENIED in part** and  Defendant UACL's Motion for Partial Summary Judgment [Doc. # 26] is **GRANTED in part and DENIED in part.**  It is further

**ORDERED** that Plaintiff Tayssoun's Application for Preliminary Injunction [Doc. # 24] is **DENIED.**  It is further

---

[43]  The Court does not intend to preclude the parties' claims or defenses that have not been challenged in the pending motions.

**ORDERED** that Plaintiff Tayssoun's Motion to Dismiss Counterclaim [Doc. # 24]

is **GRANTED in part and DENIED in part.**

SIGNED at Houston, Texas, this **20th day** of **April, 2005.**

_____
Nancy F. Atlas
United States District Judge